Illinois National Bank of Springfield, Appellee, v. United States Fidelity & Guaranty Company, Appellant.

Gen. No. 8,254.

Opinion filed January 24, 1929.

JOHNSON & PEFFERLE, for appellant.

BROWN, HAY & STEPHENS and WALTER T. DAY, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

This is an action of assumpsit brought by the appellee against appellant to recover on two policies of burglary insurance, one in the amount of $12,500 and one in the amount of $1,000, issued by the appellant to William V. Sutton on a stock of jewelry, watches and diamonds, the major part of which, it was claimed, had been taken and carried away by burglars on the night of October 23, 1926.

Appellant filed a plea of the general issue, an affidavit of merits and a notice of special defenses under the general issue. The notice of special defenses set out that Sutton did not file a proof of loss showing that he held any goods, wares or merchandise in trust or on commission, or which had been sold but not removed or for which said Sutton was liable to the owner thereof, and that Sutton was not the owner of the goods stolen; second, that Sutton did not keep a correct set of books to show the amount of the loss, if any, which he sustained; and third, that appellee was not a bona fide assignee of the account, but that the assignment was made as further security of a pre-existing debt.

. Issue was joined on the pleadings and the case was tried by a jury and there was a verdict and judgment for appellee in the sum of $13,953.50, and appellant has appealed.

Appellant has assigned error on the court overruling its motion for a new trial. The motion for a new trial was based upon errors assigned as set out in appellant's notice of defenses and upon further grounds which we shall notice.

The material provisions of the $12,500 policy are as follows:

## "UNITED STATES FIDELITY AND GUARANTY COMPANY,

### Baltimore, Maryland

herein called the Company, does hereby agree with the assured, named and described as such in Item I of the declaration forming part hereof, as respects any of the assured's property as hereinafter defined and stated in Item VIII of the declaration, to be insured hereunder:

"Indemnity for loss.—I. To indemnify the assured for all loss by burglary of any of such property from within that part of any safe or vault to which the insurance under this policy applies.

"Definitions A. It is agreed that the assured's property consisting of: (1) 'Merchandise' includes only the merchandise described in Item Five of the declarations owned by the assured or held by him in trust or on commission or sold but not removed, or for which the assured is liable to the owner thereof for such loss or damage as is covered hereby."

Item 5 of the declaration referred to was as follows:

"Item 5. The merchandise covered hereby is jewelry, watches and diamonds."

Item 8 referred to is as follows:

"Item 8. The insurance granted by this policy, including $12,500 for such damage to property as is covered hereby, shall apply specifically as follows:

"Amount of Insurance

"(b) In Safe No. 1 outside or inside of any chest or compartment therein, on money and securities, $500.00; on merchandise described in Item 5, $12,000.00; total $12,500.00.

"Exclusions

"(e) The Company shall not be liable for loss or damage: . . . (3) unless books and accounts are kept by the assured and are kept in such manner that the company can accurately determine therefrom the amount of loss or damage."

The smaller policy of $1,000 contained similar provisions:

The two policies of insurance were issued by appellant to Sutton in November of 1924, through the firm of Reisch, Morgan & Reisch, general agents of appellant.

As bearing on the meaning of this language of the policy, the proof showed that William N. Sutton, who was a diamond jeweler in room 302, Reisch Building, in Springfield, Illinois, had previously carried insurance on his stock through the firm of Reisch, Morgan & Reisch. One of the partners, Harry T. Morgan, suggested to Sutton that he change from the company in which he then carried burglary insurance to appellant. Mr. Sutton told him that he would have to see what Mrs. Sutton had to say about it. Later Mr. Morgan called again and Sutton advised him that it was all right. Morgan then sent an insurance solicitor, Larry Head, to complete the details. Sutton had been doing business under the trade name of William N. Sutton Company. Head inquired who was the company and Sutton told him that there was no company, but that it was just a trade name; that Mrs. Sutton and he had been associated together all through the business; and Sutton further said that he did not know whether "you would call it a company or what you would call it." Head then inquired how Sutton wanted the policy made up, and Sutton replied that he did not know whether it made any difference. The policy was then made up in the office of Reisch, Morgan & Reisch, and brought down to Sutton complete. The declarations appear-

ing in the policies, it was claimed, were never presented to Sutton, nor did he make the replies appearing therein to the questions therein set out, nor were the declarations ever presented to Sutton for his signature, according to his testimony.

On Saturday, October 23, 1926, Sutton left his place of business a little after 2 o'clock in the afternoon. Before leaving he placed all the merchandise of value in the safe and locked the door by means of the combination. There were a few articles of no great value left in a showcase. As Sutton left he locked the outer door leading into the corridor of the third floor of the Reisch building.

About 9 a. m. on the next day, Sunday, October 24, 1926, John Green, a fireman who was employed at the Reisch building, and Mary Reddich, discovered that the glass in the transom over the door into Sutton's office had been broken and the transom bent down on the inside. They attempted to open the door but found that it could be moved but a little way. Upon looking into the room they saw that the safe had been blown and immediately called the police and Mr. Sutton.

On arriving at his place of business, Sutton found that the doors of the safe had been blown off by nitroglycerine and that all of the jewelry and merchandise which he had placed in his safe the afternoon before had been stolen. The explosion blew the dial of the combination off the safe, driving it through the showcase and against the steel door upon the opposite side of the room with such force that it made a dent in the door. Everything in the safe had been pulled out and strewn about the room. The trays in which Mr. Sutton kept his rings were piled in front of the safe and were empty. Papers and empty watch cases were scattered about in front of the safe. The explosion was of such force that it tore the outer door of the safe apart and scattered the cement packing about the room. A clock

upon the showcase was stopped by the concussion at about 11 o'clock, indicating that the burglary had taken place at about that time the night before. Wires had been run from a light fixture in an adjoining room to the safe, and had apparently been used to detonate the nitroglycerine.

On the Sunday morning on which the loss was discovered, Wetzel, the adjuster of appellant, had some photographs made of the office. These photographs, properly identified, were received in evidence.

In the safe at the time Sutton left his office on October 23, according to the testimony, was a large stock of jewelry, consisting largely of mounted rings, diamond stickpins and brooches, loose diamonds, watches, cuff links and other articles. Sutton testified that the value of the merchandise in his safe at this time was around $40,000. W. A. Gill and Maurice Singer, jewelry salesmen from St. Louis, who visited Sutton on the afternoon of October 23, 1926, in order to sell him merchandise, testified that Sutton, in order to convince them that he did not need any merchandise, showed them about three-fourths of his stock of goods, and that the wholesale value of the mounted rings and loose diamonds which they saw at that time was between $35,000 and $45,000.

All of the diamonds, mounted and loose, and the stickpins and brooches were taken, and on the morning after the burglary there remained only a few American watches, some cuff buttons and minor articles.

The burglars also took between $50 and $60 in cash, a check for $525; rare old coins of the face value of $100, upon which there was a premium in excess of their face value; jewelry belonging to Mrs. Sutton which had been placed there for safe-keeping, of the value of between $10,000 and $12,000; a four-carat diamond valued at $2,000, upon which Sutton had loaned $1,200; a ring valued at $100, upon which Sut-

ton had loaned $50; a ruby ring valued at $125, upon which Sutton had loaned $40, and certain property consisting of two diamond rings, a watch and charm upon which Sutton had a claim for work in the amount of $42.50 and which he was keeping for the owner. With the exception of a small brooch or pin valued at $15, none of the property was ever recovered. It was claimed that the property stolen consisted of between seven or eight hundred different articles, at least three hundred of which had a value of $50 each.

Following the burglary, Sutton, at the request of Wetzel, adjuster for the appellant, delivered to the latter all of his books, papers and records. From these records Wetzel, assisted by Detective Graham of the Pinkerton Detective Agency, made up a proof of loss.

Thereafter Sutton was called to Wetzel's office and handed a loose piece of paper which was identified as page 2 of the proof of loss. The white typewritten sheets now appearing in appellee's Exhibit 4 were not attached to the outer green sheet at this time. Wetzel told Sutton that he had been called out of town and was leaving. He was in a hurry and said to Sutton, "There is the proof of loss. Just sign it here," indicating the place for signature. Sutton did not have a chance to read what he had signed because Wetzel was in such a hurry. Sutton was told that Wetzel would send the proof of loss in to the company. The only part of the proof of loss that Sutton saw upon that occasion was the page upon which appeared his signature, according to Sutton's testimony.

The evidence disclosed that Sutton kept the following books and records in his business:

1. An inventory book in which appeared a complete inventory of Sutton's stock of goods, which inventory was completed on November 29, 1925.

This inventory showed Sutton's stock at that time to consist of mounted rings, diamond brooches, stick-

pins, watches, loose diamonds, cuff links and other minor articles of the value of $37,931.48.

2. A number of invoices showing the purchases of merchandise made by Sutton between the date of the November inventory and the date of the burglary.

3. A mounted ring record containing a record of each of the mounted rings in Sutton's stock, with the number of the ring, the weight and description of the mounting, the cost of the article and its selling price. If the ring had been sold the book also showed the name of the buyer and the date of the sale.

4. A sales record, in which was kept a record of all sales of all merchandise made by Sutton, giving the names of the persons to whom articles were sold, the date of the sale and the selling price. This book was kept for two reasons, according to the testimony: (a) for Sutton's own records and (b) for determining the excise taxes assessed against Sutton by the federal government.

5. A further record of the loose diamonds was contained on the outside of the original importer's paper packages in which the loose diamonds were kept. The original papers were taken by the burglars, but similar papers, showing the manner of keeping such records, were introduced in evidence. This record, on the outside of the papers, disclosed the importer's number and the number and total weight of the stones in each paper. After a stone was taken from a paper its weight was noted and that figure was subtracted from the weight appearing on the paper, which thereafter showed the weight of the stones remaining in the package. The notation of the number of stones in the paper was also changed according to the number of the stones removed.

Various assignments of error are made touching the weight of the evidence to which we shall give no consideration. The proofs amply established the burglary.

Appellant contends that the judgment should be reversed because the policy of insurance covered goods owned by Sutton and the declaration charged ownership of the merchandise by Sutton, while the proofs showed that Sutton was not the sole and unconditional owner of the property. It is shown by the undisputed testimony in this case that appellant's agents, while carrying burglary insurance for Sutton in another company, and presumably a valid policy, solicited Sutton to transfer the insurance to appellant company, and were fully informed by Sutton as to all the particulars and details of Mrs. Sutton's interest in the property. It is not shown to be a joint interest. But whatever the interest was, it was left to appellant's agents to write a policy for Sutton on the property he had in charge or as trustee to protect him from burglary. Such a policy was written. So far as the proofs go, it is not shown that Mr. Sutton was other than a trustee as to any interest his wife had in the property. The policy does specifically purport to insure Sutton from burglary of property held by him as trustee. Taking the testimony altogether, the only conclusion that we can reach is that Sutton was trustee of his wife's property. The policy provided for just such a case: "property owned by the assured or held by him in trust or on commission," and this construction is accentuated by another provision in the policy by which appellant "reserved the right to adjust such loss or damage with the owner or owners of such merchandise, and payment of such loss or damage to such owner or owners shall constitute a full satisfaction of any claim hereunder made by the assured for such loss or damage."

We are satisfied that suit was properly brought in the name of Sutton's assignee. If it were not so, in this case appellant would be estopped from claiming the policy void under the rule laid down in *Lycoming*

*Fire Ins. Co. v. Jackson,* 83 Ill. 302; *Mazeika v. Automobile Underwriters of America,* 226 Ill. App. 239, and the facts proven in this case.

It is further contended that Sutton did not keep such a set of books as was contemplated by the policy of insurance, and that it could not be determined from his books what property and how much was burglarized. The books and all the records, together with all documents and papers, were submitted to the jury, under proper instructions, for them to determine whether, from an inventory showing purchases and sales, such a record had been kept that by checking the loss in articles and specific merchandise could be determined. We do not understand by the rule that the books must be perfect, free from any clerical or punctuation errors, but in any set of books submitted it might be found that a certain error in substance, the overlooking of an item, the disjointing of a balance or the slanting of a column had slipped in. The question would be, how substantial the error, the motive or lack of motive with which it was made, and to what extent the error had affected the parties' rights. A set of books might be submitted containing one or more specific errors in addition or subtraction and bound in gold or tied with safety pins and still be an honest set of books and determine a substantially correct result. There has been little in standardization as to the size and form and number of leaves in a volume and binding to the commercial form of books in the first 139 years of our history. The system has ranged from a few chalk marks on a beam to a large number of finely bound, large and small volumes playing hide and seek with each other and containing little but Arabic numerals and a few shorthand notes from which or by which large sums disappear or move quietly through long periods of time. All of this led the courts to say as the

court said in *Beaird v. New Jersey Plate Glass Co.,* 157 Ill. App. 1, in an identically similar case:

"It appears that appellee and his partner kept a little book showing the amount of money received from the gambling room . . . and also a sheet of paper, upon which was marked down the amount of the saloon receipts for each day, which was placed in an envelope, both of which appear to have been in the safe and were lost at the time the money was taken. While the manner of keeping the accounts was rather crude and informal, yet if the statements contained therein were accurate, they would show the amounts actually in the safe, and from them the loss might be correctly determined. We would not therefore feel justified in holding that there was such a failure to comply with that requirement of the policy as to justify us in setting aside the judgment on that account."

In *Liverpool & London & Globe Ins. Co. v. Kearney,* 180 U. S. 132 (45 L. Ed. 460), in a similar case the court said:

"The assured under this policy hereby covenants and agrees to keep a set of books, showing a complete record of business transacted, including all purchases and sales, both for cash and credit, together with the last inventory of said business . . . and, in case of loss . . . to produce such books and inventory; and in the event of failure to produce the same, this policy shall be deemed null and void."

"The covenant and agreement 'to keep a set of books showing a complete record of business transacted, including all purchases and sales, both for cash and credit, together with the last inventory of said business,' should not be interpreted to mean such books as would be kept by an expert bookkeeper or accountant in a large business house in a great city. That provision is satisfied if the books kept were such as would fairly show, to a man of ordinary intelligence, 'all pur-

chases and sales, both for cash and credit.' There is no reason to suppose that the books of the plaintiff did not meet such a requirement."

"We are of opinion that the failure to produce the books and inventory, referred to in the policy, means the failure to produce them if they are in existence when called for, or if they have been lost or destroyed by the fault, negligence or design of the insured. Under any other interpretation of the policies, the assured could not recover if the books and inventory had been stolen, or if they had been destroyed in some other manner than by fire."

There were some errors or an error in Sutton's books. One ring sold to appellant's agent had not been recorded on the ring book. But it was fully explained and shown that the failure to record made no change whatever in the figures of Sutton's stock on hand. The record of the diamonds imported had been stolen with the goods and could not be furnished, but other proofs were submitted as to their existence and that they formed a part of Sutton's stock. The opinion of this court is that the proofs submitted are sufficient to show that Sutton complied with the provisions of the policy and the proofs of value are ample to support the verdict.

There is an assignment of error that Sutton never made a proof of loss, that is, we take it to mean a correct proof of loss. Appellant complains that the proof of loss made shows that Sutton was the owner of the goods stolen except three certain rings, and does not show that Sutton held any goods in trust for his wife. Appellant, through Wetzel, its agent, and a detective undertook to prepare and did make Sutton's proof of loss. At that time Mrs. Sutton's diamonds and jewelry were talked over. Wetzel testified that he stated to Sutton then that Mrs. Sutton's articles were not covered by the policy and could not be paid for. He

further testified that Sutton never told him that Mrs. Sutton owned any part of the merchandise. He did not testify, however, but that Sutton told him that *his wife was interested in the goods*. If appellant and its agents prepared the proofs of loss and had all of the facts before them, they cannot be heard to say that the proofs of loss are technically incorrect. Appellant cannot be prejudiced by this error, if it is such, as appellant has paid Mrs. Sutton nothing for her loss and appellee in this suit holds an assignment of all of her claim. Appellant does not argue the assignment that appellee was not a bona fide asignee of the claims.

Appellant complains because the court sustained an objection to counsel's cross-question to Sutton: Why the firm of Whitney and Klaholt did not give him a report on his books? The court properly sustained the objection.

Appellant assigns error upon the giving of certain instructions for appellee. We have examined these instructions and find no reversible error in the instructions as given. If Sutton was trustee for his wife, had her money in the business or was using her property (in just what manner is not made plain by the proofs in this case), then under the terms of the policy Sutton had the right to sue for and recover in this suit the value of his wife's interest in said goods. Sutton then had an insurable interest in the goods.

The court refused certain instructions for appellant. We have examined these instructions and are of the opinion that the court's refusal to give them would not warrant us in reversing the judgment in this case.

Appellant complains that the court refused to admit in evidence a certain debtor's schedule that Sutton had filed in court in 1922 and a tax schedule that Sutton's wife filed with the county treasurer in 1926. Certainly there was no foundation laid for the offer of the

latter instrument and no proofs in the record covering Sutton's property in 1922. We are unable to find any index to these instruments in the abstract or the record and doubtless counsel considered them of so little value that they were not included in the record.

Finding no reversible error in the record of this cause, the judgment of the circuit court of Sangamon county is affirmed.

*Affirmed.*